## STATE OF MARYLAND for Use of JOHNSON et al. v. UNITED STATES et al.

### No. 5672.

Circuit Court of Appeals, Fourth Circuit.

Jan. 31, 1948.

Paul Berman, of Baltimore, Md. (Sigmund Levin and Theodore B. Berman, both of Baltimore, Md., on the brief), for appellants.

George W. P. Whip, of Baltimore, Md. (Bernard J. Flynn, U. S. Atty., Carl Ross McKenrick, Asst. U. S. Atty., and Lord & Whip, all of Baltimore, Md., on the brief), for appellees United States and De La Rama S. S. Co.

B. Conway Taylor, Jr., of Baltimore, Md. (W. Hamilton Whiteford and Due, Nickerson & Whiteford, all of Baltimore, Md., on the brief), for appellee American Ship Service Co.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

■ This is an appeal from a judgment of the District Court dismissing libels in two cases filed against the United States of America and the De La Rama Steamship Company. In the first case the libel was filed in the name of the State of Maryland to the use of Ella V. Johnson, the surviving widow, and Jennie Johnson, the surviving mother of George D. Johnson, deceased, under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and under the Maryland death by wrongful act statute, Article 67, Sections 1, 3, of the Maryland Code (1939). In the second case the libel was filed by Ella V. Johnson as administratrix of the estate of George D. Johnson under the Suits in Admiralty Act and under Article 93, Section 109, of the Maryland Code (1939). The Suits in Admiralty Act provides that no vessel owned by the United States, or by any corporation of which the United States shall own the entire outstanding capital stock, or which shall be operated by or for the United States or such corporation, shall be subject to seizure by judicial process, but a libel in personam may be filed against the United States, or such corporation, in cases where a proceeding in admiralty could be maintained if the vessel were privately owned. Sections 1 and 3 of Article 67, Md. Code (1939), provide that in the case of death by wrongful act, neglect or default, an action may be brought by and in the name of the State of Maryland for the benefit of the wife, husband, parent and child of the perrson whose death shall have been so caused. Article 93, Section 109, of the Maryland Code provides that if the death of a person results from a wrong for which a personal action might have been maintained or commenced, the executor or administrator may prosecute an action to recover funeral expenses not exceeding $300 in addition to any other damages recoverable in such actions. This latter statute is independent of Article 67 of the Maryland Code and, in the case of a death by wrongful act, separate actions may be maintained under both statutes. Stewart v. United Electric Light & Power Co., 104 Md. 332, 65 A. 49, 8 L.R.A.,N.S., 384, 118 Am.St.Rep. 410. However, because of the similarity of the issues involved, the two libels were consolidated in the District Court. American Ship Service Company was impleaded as respondent in both libels over its protest upon the petition of the original respondents.

. The principal issues on this appeal relate to the District Judge's findings of fact. The deceased, George D. Johnson, was a stevedore employed by the American Ship Service Company, a stevedoring company which had contracted to clean the holds of the S. S. Elihu Thompson. She was a Liberty ship owned by the United States and operated by its agent, the De La Rama Steamship Company. She was lying at the time in the navigable waters of the United

States at Pier No. 1 of the Maryland Dry-dock Company in the Baltimore harbor. She had previously carried a cargo of grain from Vancouver in British Columbia to Rotterdam, whence she had returned to Baltimore.

In order to facilitate the carriage of grain from Vancouver to Rotterdam, so called "shifting boards," over 20 feet in height, had been set up in the holds of the ship to prevent shifting of the grain during the passage. They traversed each hold from fore to aft, and were placed on edge in grooves running down the center of the holds. The shifting board in hold No. 2, in which we are particularly interested, consisted of three fir panels joined together. These panels, in turn, were supported by timber beams known as "shores" which were attached to the shifting board by cleats and extended from the panels in a downward and outward direction until they reached the skin of the ship. Originally the shores were secured in part at this end by sweat battens, but the battens were removed at Rotterdam following the discharge of the grain cargo, and thereafter the shores were supported only by the frame and the curvature of the ship. After the grain had been discharged at Rotterdam, the holds were loaded with wet sand ballast. When the ship arrived in Baltimore the ballast was discharged and in order to assist this operation, the center panel, and possibly the fore panel, of the shifting board in hold No. 2 was removed, as were the shores which supported the removed panel or panels. The aft panel, however, and two supporting shores on the starboard side and one on the port side were retained in hold No. 2, so as to facilitate the carriage of grain in the future. After the holds had been cleaned to the extent that they were "shovel clean," the American Ship Service Company was engaged to complete the removal of the ballast.

Johnson, the deceased, was one of the gang of stevedores employed by American to remove the sand from hold No. 2. For this purpose they used an oil drum which was operated by the ship's winches and was lowered into the hold, where it was filled by the stevedores. When filled with the wet sand ballast, the drum weighed approximately 500 pounds. The drum was lowered and raised into and from the hold in a perpendicular line at a distance of approximately 2 or 3 feet from the shore supporting the aft panel on the port side. On one occasion, as the drum was being raised, it swung over and hit the shore which was cleated near the top of the shifting board, so that it was dislodged and fell upon Johnson who had been shoveling sand into the drum. Johnson was removed to a hospital where, after several days, he died.

The libelants take the position that the Thompson was not seaworthy in that her appliances were defective and that her unseaworthiness contributed to the accident. Alternatively, they argue that the respondents were guilty of negligence in not having provided Johnson with a safe place to work. Evidence was given by men working in the hold tending to show that the shore was not properly attached to the panel in that one of the cleats by which it was secured was missing; that it was not properly secured at the skin of the ship as the sweat battens supporting the shores had been removed; that the aft panel had been left in a shaky condition by the removal of the center panel and that this added to the instability of its attachment to the shore; and that the panels had rotted and were defective and dangerous at the time of the accident. Some reference was also made in the testimony to the fact that the winches for hold No. 2 were damaged and that the winches for hold No. 1 were used in connection with the No. 2 boom in the removal of the ballast; and it is argued that this method of rigging made it necessary to raise and lower the drum in close proximity to the shore.

On the other hand, the chief mate of the Thompson testified that he had inspected the shores and shifting board before the stevedores came aboard the ship to clean it, and that all four of the cleats supporting the shore were in place. He also testified that the panels were not in shaky condition and that the removal of the center panel had not weakened the stability of the aft panel. There was also evidence tending to show that the removal of the

sweat battens so that the shore was supported by the frame and curvature of the ship did not impair the security of the structure. The sweat battens, which originally helped to support the shore, were removed in Rotterdam and the ship returned from that port to Baltimore without dislocation of the timbers so that there was good reason to believe that they were secure while the ship lay at anchor in the Baltimore harbor. It was also shown that the method of rigging the winches and boom had been effected by the Terminal Company that discharged the ship, and if this arrangement brought the iron bucket into dangerous proximity with the shore, the stevedoring company could easily have rearranged it in the course of an hour or so, but failed to do so.

The District Judge reached the conclusion upon all of this testimony that the fall of the shore was not caused by the absence of a cleat at one end of the shore or the absence of the sweat battens at the other end of the timber, but that the shore was caused to fall by the negligent operation of the iron bucket employed for the removal of the sand. He found that the heavy bucket during the operation was permitted to strike the shore a glancing blow near the point where it was attached to the shifting board and that the force of this blow was sufficient to have caused the fall of the shore even though the four cleats were in place at one end of the timber and the sweat battens at the other. In short, he concluded that the accident was caused by the negligence of the stevedoring company and not by defects in the arrangement of the boards and timbers in the hold of the ship.

It is contended that the judgment based on these findings should be reversed on the ground that the weight of the testimony leads to the contrary conclusion, especially as the libelant's witnesses testified in open court whereas the testimony of the mate upon which the defense especially relied was taken by deposition. The judge, however, did see and hear the steve-

dores in person and without questioning their sincerity, concluded that their evidence was not as reliable as that of the mate who, having retired from maritime service at the time of his testimony, was no longer connected with the ship. The judge found his testimony particularly convincing since he was responsible for the condition of the holds and personally supervised the arrangement that has been described. Although an appeal in admiralty partakes of the nature of a trial de novo, and we are at liberty to consider the evidence anew, we discover no error and no reason to depart from the rule that a finding by the trial court upon conflicting testimony is presumptively correct even though the evidence is presented in written form.

This conclusion also disposes of the contention that the ship was unseaworthy and that the death of the deceased was due to this unseaworthy condition. Seaworthiness is essentially a question of fact, Mahnich v. Southern S. S. Co., 321 U.S. 96, 98, 64 S.Ct. 455, 88 L.Ed. 561; and in this case the District Judge has found that there were no defects in the arrangement in the holds which produced an unseaworthy condition, and has also found that the accident was due entirely to the negligent operation of the appliances by the stevedoring company.

Having reached these conclusions, we have no occasion to consider the question whether the American Ship Service Company was properly impleaded as party respondent against its will in view of the fact that it had secured the payment of compensation to the deceased under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., or the question whether the libelants had any standing to prosecute this appeal in either case in view of the fact that after the judgment was rendered by the District Court they accepted a compensation award under that statute.

Affirmed.